1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SEQUENOM, INC. STOCKHOLDER LITIGATION | Lead Case No. 16-cv-02054-JAH-DDL |
| | CLASS ACTION |
| This Document Relates To: | **ORDER GRANTING DEFENDANTS' AMENDED MOTION TO DISMISS** |
| ALL ACTIONS. | |

**INTRODUCTION**

In this shareholder class action lawsuit, Plaintiffs allege that Defendant Sequenom, Inc. and seven of its former board members ("Defendants") violated Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") by issuing a false and misleading recommendation statement advising Sequenom shareholders to tender their shares pursuant to a tender offer.  Pls.' Consolidated Amended Class Action Complaint ("AC"), Doc. No. 54.[1]  Specifically, Plaintiffs allege that Defendants relied on a lower set of financial projections (and excluded

---

[1] Those seven individuals are Kenneth F. Buechler, Myla Lai-Goldman, Ronald M. Lindsay, Catherine J. Mackey, David Pendarvis, Charles P. Slacik. and Dirk van den Boom (collectively, "Individual Defendants").  The parties stipulated to the dismissal of claims against Richard A. Lerner, another former board member, following his death.  Doc. No. 129.

an oncology program) as the most accurate view of the company's prospects, and therefore misled Plaintiffs concerning the fairness of Laboratory Corporation of America Holding's ("LabCorp") tender offer.   Pending before the Court is Defendants' Amended Motion to Dismiss ("Mot.") and Request for Judicial Notice ("RJN").   Doc. Nos. 123, 124.   Plaintiffs opposed both.   Doc. No. 126 ("Opp'n"); Doc. No. 127 ("Opp'n to RJN").   Defendants filed replies.   Doc. No. 132 ("Reply"), Doc. No. 133 ("Reply to RJN").   The motion is fully briefed.   The Court found this motion suitable for determination on the papers submitted and without oral argument.   Civ. LR 7.1(d.1).   For the reasons set forth below, the Court GRANTS Defendants' Amended Motion to Dismiss and DISMISSES the Amended Complaint without prejudice.

## FACTUAL BACKGROUND

Sequenom was a molecular diagnostic testing and genetics analysis company. AC ¶ 2.   In 2011, it launched the first noninvasive prenatal test ("NIPT") in the United States that could screen pregnant women for Down syndrome and other chromosomal abnormalities through a blood test.   *Id.* ¶ 39.   Sequenom subsequently expanded this test ("MaterniT21 PLUS") to detect a myriad of additional fetal chromosomal abnormalities.   *Id.* ¶ 40.

Sequenom had a "breakout year" in 2014.   *Id.* at 8.   The company sold its Bioscience segment to focus exclusively on its NIPT business and launched a new, lower cost NIPT called VisibiliT, which targeted women with average-risk pregnancies, in the international market.   *Id.* ¶¶ 44, 48.   Sequenom planned to sell VisibiliT in the United States market in 2015.   *Id.* ¶ 49.   Sequenom also entered into several agreements with other companies.   In June 2014, Quest Diagnostics Inc. agreed to exclusively offer the MaterniT21 PLUS test to its network in exchange for access to Sequenom's NIPT patents.   *Id.* ¶¶ 45–46.   Under this agreement, Quest could develop its own NIPT so long as it paid Sequenom licensing and royalty fees

per test.  *Id.*  In December 2014, Sequenom entered into a pooled patents agreement with Illumina, Inc. as part of the settlement of a protracted lawsuit in which Illumina sued Sequenom for patent infringement.   *Id.* ¶ 51.   Among the terms of the agreement, Sequenom and Illumina would pool together their patents.  *Id.*  Illumina had the right to use the patent pool to develop its own NIPT kits and could also license the patents in the pool to other labs.  *Id.*  In exchange, Sequenom would receive licensee fees and royalties, as well as a lump sum payment from Illumina of $50 million upfront and at least $80 million by 2020.  *Id.*

Sequenom had a "transition year" in 2015.  *Id.* at 11.  The company launched several new tests, including VisibiliT (mentioned above), HerediT Universal (a carrier screening test), and MaterniT GENOME (a test that could analyze every chromosome).  *Id.* ¶¶ 62, 68, 80, 118.  The company cautioned investors that it expected short-term revenue loss as customers increasingly converted to licensees, but reaffirmed the company's long-term growth potential.  *See, e.g.*, *id.* ¶¶ 63, 70, 79.  For example, Sequenom told investors that the patent pool was growing; that it expected major growth for MaterniT GENOME; and that there was significant long-term value in the average risk market, which was significantly bigger than the high-risk market.  *Id.* ¶ 86, 125.  At a presentation to investors and analysts on September 28, 2015, one of Sequenom's slides indicated "[o]ver $500M [in] revenues by 2020." Ex. 10 to Mot. at 17, Doc. No. 123-12.

Meanwhile, Sequenom's financial reports for this period reflected consistently negative revenue growth.  *See* AC ¶ 70 (2015 Q1), ¶ 77 (2015 Q2), ¶ 105 (2015 Q3), ¶ 123 (2015 Q4), ¶ 132 (2016 Q1).  By the time Sequenom held its full-year 2015 earnings call, its stock was trading at $1.45 per share, down from $3.83 at the beginning of 2015.  Ex. 22 to Mot. at 10–16, Doc. No. 123-24.

Sequenom also decided to expand its business into the field of oncology.  AC ¶¶ 57–59.  In 2015, the company began a process to develop liquid biopsy oncology

tests that could detect tumor cells from a blood test. *Id.* This involved "building a clinical foundation" and engaging medical leaders to develop a test that could eventually be submitted for validation. *Id.* ¶ 58. Although the process was at its early stages, Sequenom told the public that it expected long-term value for the oncology program, given that this market size was significantly higher than that of NIPT. *Id.*

Sequenom's Board also began taking actions to address its $130 million convertible debt, which was due in 2017 and 2018. *Id.* ¶ 75. The Board engaged J.P. Morgan Securities LLC ("JPM") as its financial advisor to explore refinancing opportunities as well as opportunities for "spinning off" Sequenom's oncology program. *Id.* ¶ 76, 82, 88. JPM reached out to approximately twenty-five parties and entered into confidentiality agreements with four companies, one of which was LabCorp. Schedule 14D-9, Sequenom, Inc. ("Rec.") at 13–14, Ex. 16 to Mot., Doc. No. 123-18. By the end of the 2015, LabCorp and a few other companies had made offers to acquire all of Sequenom. *Id.* at 14–15; AC ¶ 108. But the Board instructed Sequenom management and JPM to not pursue any proposals for a sale of Sequenom because it wanted to eliminate its $130 million convertible debt overhang and focus on operations as a stand-alone business. AC ¶ 108.

At the start of 2016, Sequenom announced a restructuring plan. *Id.* ¶ 116. This included reducing its workforce by approximately 20%, closing its North Carolina lab, and seeking to partner its oncology program while reducing research and development in that area. Rec. at 15–16; AC ¶ 116. In response to this news, over twenty companies expressed interest in the oncology program. Six of these companies signed confidentiality agreements and engaged in due diligence review over the period of five months. *Id.* ¶ 117. In the end, however, none of these parties

submitted a licensing, partnering, or acquisition proposal.  Amendment No. 6 to Schedule 14D-9, Sequenom, Inc. ("Am.") at 4, Ex. 17 to Mot., Doc. No. 123-19.[2]

Sequenom continued to explore refinancing opportunities.  AC ¶ 136.  In May 2016, the CEO of LabCorp contacted Sequenom's CEO to express interest in a potential transaction.  *Id.* ¶ 137.  On June 7, 2016, Sequenom received a proposal from a debt source for a proposed senior secured loan for up to $150 million.  *Id.* ¶ 140.  The next day, the Board asked JPM to contact companies interested in Sequenom and offer a price per share in the $3.00 range.  Rec. at 17.  Based on interest from LabCorp and two other companies, Sequenom opened a virtual data room with preliminary due diligence information.  *Id.* at 18.

The Board met on June 15 and 16, 2016.  Sequenom management presented the Board the following revenue projections for its oncology program ("Oncology Projections"): $0 (2016), $5 million (2017), $20 million (2018), $45 million (2019), and $73 million (2020).  AC ¶ 147.

On June 21, LabCorp offered $1.70 to $2.00 per share to acquire Sequenom. Rec. at 18.  The next day, another company offered $2.00 per share.  *Id.*  The Board instructed JPM to redirect the parties to submit revised proposals with higher offers. *Id.*  On July 19, LabCorp offered $2.30 per share.  *Id.*; AC ¶ 149.  After a series of counteroffers, Sequenom and LabCorp agreed on a final price of $2.40 per share. Rec. at 19; AC ¶ 151.

On July 26, 2016, the Board unanimously approved the merger. AC ¶ 156. Sequenom's stock traded at $0.84 per share the day before.  Ex. 22 at 18.  The Board's decision to approve the merger relied on one set of financial projections ("Management Projections") instead of another ("Optimistic Case Projections").[3] Rec. at 25.  Sequenom management provided the Board and JPM these sets of

---

[2] Page citations to this document refer to the ECF pagination.

[3] Plaintiff refers to these projections as the "Reduced Forecast" and the "Expected Forecast," respectively.  AC ¶ 83.

projections beginning in the second half of 2015 and through the time of LabCorp's offer.  AC ¶¶ 83, 114; Rec. at 23, 25.  Neither set of projections included the oncology program.  AC ¶ 83.  The Board decided to use only the Management Projections in evaluating the fairness of LabCorp's offer.  Rec. at 25.[4]  Per the Board's direction, JPM relied on the Management Projections and not the Optimistic Case Projections for purposes of rendering its fairness opinion; it calculated a value between $2.00 and $2.55 per share.  *Id.*; AC ¶¶ 12, 154.

On August 9, 2016, LabCorp commenced the tender offer and Sequenom filed the Board's recommendation statement ("Recommendation") with the SEC.  *Id.* ¶¶ 164–65.  Sequenom filed an amendment to the Recommendation on August 30, 2016.  Am. at 8.  The Recommendation provided shareholders the Management Projections, Optimistic Case Projections, and Oncology Projections.  Rec. at 24–25; Am. at 5–6.  LabCorp subsequently announced the completion of the acquisition on September 7, 2016, with approximately 69% of Sequenom shares tendered.  AC ¶¶ 166–67.

## PROCEDURAL BACKGROUND

The Court assumes familiarity with the long-running history of this dispute up until its last substantive order.  *See In re Sequenom, Inc. S'holder Litig.*, No. 16-cv-2054, 2019 WL 1200091, at *1 (S.D. Cal. Mar. 13, 2019) (granting Defendants' motion to stay pending Supreme Court review of *Varjabedian v. Emulex Corp.*, 888 F.3d 399 (9th Cir. 2018), which held that claims under Section 14(e) do not require a showing of scienter).  After the Supreme Court in *Varjabedian* dismissed the writ of certiorari as improvidently granted, 139 S. Ct. 1407 (2019), this Court lifted the stay and ordered supplemental briefing.  Doc. No. 97.  On May 31, 2022, the Court

---

[4] At the time of the merger, the Management Projections predicted revenues of: $126 million (2016), $161 million (2017), $210 million (2018), $257 million (2019), and $330 million (2020). Rec. at 24.  The Optimistic Case Projections predicted revenues of: $126 million (2016), $173 million (2017), $240 million (2018), $329 million (2019), and $426 million (2020).  *Id.* at 25.

ordered a briefing schedule concerning Defendants' amended motion to dismiss and asked the parties to incorporate all arguments from previous briefs and notices of authority that they wished the Court to consider.  Doc. No. 118.  Defendants' amended motion to dismiss and request for judicial notice are now ripe for decision.

## LEGAL STANDARD

The proper pleading standards in this case are Rule 12(b)(6), "Rule 9(b), Section 4(b)(1) of PSLRA, and *Twombly*/*Iqbal*."   *In re Finjan Holdings, Inc. ("Finjan II")*, 58 F.4th 1048, 1059 (9th Cir. 2023).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant when the plaintiff fails to state a claim upon which relief may be granted.  *Intake Water Co. v. Yellowstone River Compact Comm'n*, 769 F.2d 568, 569 (9th Cir. 1985).  Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533–34 (9th Cir. 1984).  When evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  The complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Therefore, for a complaint to survive a motion to dismiss, the non-conclusory facts and reasonable inferences from those facts must plausibly suggest the plaintiff is entitled to relief.  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

In addition, "[i]t is undisputed that Section 4(b)(1) [of the PSLRA] applies to all Section 14(e) actions."  *Finjan II*, 58 F.4th at 1058.  That provision provides,

> In any private action arising under [the Exchange Act] in which the plaintiff alleges that the defendant . . . made an untrue statement of a material fact . . . the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  The Ninth Circuit has described this as a "heightened standard which requires increased particularity for allegations of untrue statements of material fact." *Finjan II*, 58 F.4th at 1057.

Finally, Rule 9(b) of the Federal Rules of Civil Procedure also applies here. That rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b). Because Plaintiffs allege that Defendants acted with scienter, AC ¶ 230, their claim "sounds in fraud" so "the pleading of [their] claim must comply with Rule 9(b), even if fraud is not an essential element of the claim."  *Finjan II*, 58 F.4th at 1057.

## DISCUSSION

### I.     Request for Judicial Notice and Incorporation by Reference

Defendants attached twenty-two exhibits they request the Court to consider in resolving the amended motion to dismiss.  Plaintiffs oppose admitting Exhibits 1–21.  For the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Defendants' request.

"[W]hen ruling on Rule 12(b)(6) motions to dismiss," courts should consider "documents incorporated into the complaint by reference[] and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  In the Ninth Circuit, "[b]oth of these procedures permit district courts to consider materials outside a complaint, but each does so for different reasons and in different ways." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

"[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself.  The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* at 1002.  Incorporation is proper "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).

Judicial notice, by comparison, "permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Id.* at 999 (quoting Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)).  There are limits to this doctrine: "a court cannot take judicial notice of disputed facts," and "[j]ust because the document is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.*

The Court finds that Exhibits 4–12 and 16–17 are incorporated by reference.[5] The Recommendation (Ex. 16) and Amendment (Ex. 17) are extensively cited in the Amended Complaint and also form the basis of Plaintiffs' claims because they are "what inspired [Plaintiffs'] claims as the sources of the allegedly fraudulent statements." *In re Ocera Therapeutics, Inc. Sec. Litig. ("Ocera I")*, No. 17-cv-6687, 2018 WL 7019481, at *5 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x 603 ("*Ocera II*") (9th Cir. 2020).  Exhibits 4–12 consist of earnings call transcripts, conference transcripts, and an investor slide deck.  Plaintiffs extensively quoted and discussed the content of these documents to "bolster" their claim that Defendants objectively and subjectively knew that the Recommendation was false. *Id.*  The press releases

---

[5] The Court notes that Plaintiffs' opposition to Defendants' first motion to dismiss conceded the propriety of incorporating Exhibits 1–15.  RJN at 6–7.

(Exs. 1–3) and SEC forms (Exs. 13–15), however, are not incorporated because they are not extensively referenced in the Amended Complaint.  Plaintiffs also oppose judicial notice of Exhibits 13–15 and 18–21.  "Since these exhibits are not necessary to this decision, however, judicial notice is not appropriate."  *Ocera I*, 2018 WL 7019481, at *6.

## II.    Plaintiffs' Section 14(e) Claim

Section 14(e) provides in full,

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e).

"To state a claim under Section 14(e), a plaintiff must allege that (1) the defendant made a false statement of material fact or misleadingly incomplete statement, (2) shareholders relied on the false or misleadingly incomplete statement in accepting or rejecting the tender offer, and (3) shareholders suffered an economic loss as a result of the acceptance or rejection of the tender offer."  *Finjan II*, 58 F.4th at 1055 (citations omitted).  "Section 14(e) was enacted as one of the 1968 Williams Act amendments to the Exchange Act, for the purpose of 'insur[ing] that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information.'"  *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1167 (9th Cir. 2009) (citation omitted).

The parties in this case agree that the alleged falsity at issue is a statement of opinion, not a statement of fact.  Mot. at 11–12; Opp'n at 10.  Thus, it is undisputed that Plaintiffs must adequately allege both "subjective falsity" and "objective

falsity." *Finjan II*, 58 F.4th at 1056.  In other words, "the plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue." *Id.* (cleaned up) (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017)).

Here, Plaintiffs argue that Defendants violated Section 14(e) because the Recommendation materially misled Sequenom shareholders about the fairness of LabCorp's offer.  Plaintiffs aver that the Recommendation is objectively false because: (1) the Management Projections failed to take into account Sequenom's oncology program; and (2) the Optimistic Case Projections offered the most accurate view of Sequenom's future prospects.  Plaintiffs argue that the Recommendation is subjectively false because Defendants knew about the oncology program and the Optimistic Case Projections and therefore did not believe the Recommendation's conclusion that $2.40 per share was a fair price.  Plaintiffs also argue that the Recommendation contained misleading omissions.  Finally, Plaintiffs contend that they relied on the materially misleading Recommendation and suffered an economic loss equal to the difference between what they actually received and Sequenom's true value at the time of the acquisition.

Defendants argue that Plaintiffs failed to plead particularized facts showing that the Recommendation was objectively and subjectively false or that it contained misleading omissions.  In Defendants' view, Plaintiffs' case is nothing more than a disagreement with the Board's business judgment.  Defendants also contend that Plaintiffs failed to adequately plead loss causation.  The Court will analyze each of these arguments in turn.

### A.    Objective Falsity

To establish objective falsity, Plaintiffs must adequately allege that "the revenue projections/share-value estimations did not reflect [the company's] likely future performance." *Finjan II*, 58 F.4th at 1056; *see also Dearborn*, 856 F.3d at

615 (objective falsity inquiry turns on whether "the belief is objectively incorrect"). Defendants argue that Plaintiffs failed to allege particularized facts showing that the Recommendation was objectively false. They claim that the Management Projections accurately reflected Sequenom's true value. Plaintiffs counter that the Optimistic Case Projections better reflected Sequenom's public statements about its future growth and that the Oncology Projections demonstrated Sequenom's continued commitment to a viable part of its business model. The Court will discuss the Oncology Projections first before turning to the Optimistic Case Projections.

### 1.    Oncology Projections

JPM's fairness opinion did not rely on the Oncology Projections. The Recommendation explained that neither the Management nor Optimistic Case Projections included the oncology program "due to the significant investment which would have been required to realize the potential revenue opportunity for that business and Sequenom's lack of available cash to make such an investment." Rec. at 5. And "even if such an investment were made in the oncology business," the Recommendation continued, "any projections relating to that business would reflect an operating loss through 2020." *Id.* Plaintiffs argue that the projections should have included the oncology program because: Sequenom's public statements demonstrated that it was a "key component" of its future growth; Sequenom was on track with the program's "technical milestones"; and Sequenom's management had developed "specific revenue expectations" for the program. Opp'n at 14.

Plaintiffs, however, rely on a "selective reading" of public statements to support their theory. *Ocera I*, 2018 WL 7019481, at *6. Plaintiffs harp on the fact that "Sequenom spent a significant amount of effort in 2015 developing its oncology program" but neglect to discuss the company's noticeable shift in 2016. AC ¶ 178. In January 2016, Sequenom told the public that it had "refocused [its] commercial strategy" and decided to "seek partners" for the oncology program. Ex. 11 to Mot.

at 6, Doc. No. 123-13; *see* Ex. 8 to Mot. at 4–5, Doc. No. 123-10 (acknowledging the "significant reduction of [it]s oncology program" so it could "focus [its] efforts on [its] reproductive health business"); Ex. 12 to Mot. at 5, Doc. No. 123-14 (announcing "we are not going to continue funding clinical utility studies" in its oncology program to "focus[] as a Company on rebuilding the growth in reproductive health").

Even though the oncology program made significant process in 2015, its "potential clinical utility" was still developing at an "early" stage.  Ex. 8 to Mot. at 5.  Sequenom cautioned that "the clinical validation work for something like this is significant" and, in Sequenom's case, required "partnering opportunities."  Ex. 11 to Mot. at 5.  It explained that a "partnering strategy" would allow it to "retain[]" the oncology program's value and "allow[] [it] to participate in the future growth potential of that."  *Id.* at 6.  But no partnering strategy emerged.  "Over 20 companies expressed interest," and "six parties signed confidentiality agreements and began confidential due diligence review" lasting through May 2016.  Am. at 4.  Yet "none of the parties moved forward with draft licensing, partnering or acquisition terms."  *Id.*  Accordingly, Sequenom's decision not to incorporate the Oncology Projections into its valuation of the company was not objectively false.

*Montano v. Keurig Green Mountain, Inc.*, 237 F. Supp. 3d 163 (D. Vt. 2017), offers some insight here.  Defendants rely on it for the proposition that a company's "general statements" of optimism about a new product line cannot on its own demonstrate that its subsequent decision to discount the value of that product is objectively false.  *Id.* at 173.  Plaintiffs counter that unlike the 50% probability discount that Keurig applied to its new product's financial projections (which the court found not objectively false), Sequenom inappropriately chose to omit the Oncology Projections *altogether*.  Opp'n at 15–16.  On balance, Defendants' reading is more persuasive.  Whereas Keurig applied a 50% probability discount after

16-cv-02054-JAH-DDL

*launching* its new appliance line, Sequenom stopped "funding clinical utility studies" of its oncology program altogether and could not find any investor that was willing to pour into the program so that it could potentially reach a commercially viable outcome. Ex. 12 to Mot. at 5. In other words, whereas Keurig's new product faced risks and uncertainty in the market, Sequenom did not have a new product to offer at all. Because Sequenom never encountered a "recent history of success" or "past experience" with a commercialized oncology program, much less market interest in pushing the program to commercial viability in the future, Plaintiffs have failed to offer a basis to infer that the Board's decision to exclude the Oncology Projections was objectively false. *Keurig*, 237 F. Supp. 3d at 173–74.

Plaintiffs point to the Oncology Projections' five-year revenue figures as evidence of the program's ongoing value. But the Recommendation addressed this issue head on. First, it explained that the potential revenue that the oncology program could generate was contingent on "significant investment"—the same tune that Sequenom had conveyed to the public prior to LabCorp's tender offer. Am. at 5. No company in the market wanted to commit to the oncology program, however, so no commercialization was in sight. Second, the Recommendation explained that even if an investment was made, the projections relating to that business would reflect an operating loss through 2020. *Id.* Besides simply disagreeing with the Board's position, Plaintiffs have not pled facts showing it was objectively false.

### 2. Optimistic Case Projections

Sequenom's decision not to use the Optimistic Case Projections was also not objectively false. According to Plaintiffs, Sequenom consistently maintained positive long-term revenue expectations for its reproductive health business from September 2015 until the Board's approval of the merger in July 2016. Plaintiffs contend that this shows that the Board's adoption of the Management Projections

1  was objectively false.  Opp'n at 19.  But Plaintiffs' position requires inferential leaps

2  in reasoning and is not supported by caselaw.

3       Plaintiffs' leading case, *Brown v. Papa Murphy's Holdings Inc.* ("*Papa*

4  *Murphy's III*"), No. 19-cv-5514, 2021 WL 1574446 (W.D. Wash. Apr. 22, 2021), is

5  inapposite.[6]  That case also involved a shareholder class action under Section 14(e)

6  against a company (Papa Murphy's) and its directors for recommending a tender

7  offer as fair.  *Id.* at *1.  The company directed its financial advisor to create and use

8  a set of lower projections ("Base Case Projections") rather than the company's

9  higher projections ("Management Case Projections") in assessing the fairness of the

10 buyer's offer.  *Id.*  The district court ruled that the plaintiffs adequately pled that the

11 Base Case Projections were objectively false because "the slashing of the

12 Management Case to create the Base Case was inconsistent with various statements

13 [a director] and Papa Murphy's made during the relevant time period indicating that

14 the Company's prospects were strong and expected to significantly improve."  *Id.* at

15 *2 (citation omitted).

16      Although *Papa Murphy's* shares some surface-level similarities with this

17 case, it is distinguishable in several important ways.  First, unlike *Papa Murphy's*,

18 the alleged facts show that Sequenom did not create (much less direct its financial

19 advisor to create) the Management Projections for the purpose of assessing

20 LabCorp's tender offer.  Instead, the Board had access to both the Management

21 Projections and the Optimistic Case Projections *since the second half of 2015*, long

22 before LabCorp's offer in July 2016.  AC ¶ 83; Rec. at 25.  Thus, the Management

23 Projections in this case were not "create[d]" by "slashing" a preexisting set of

24 projections downward to justify a tender offer.  *Papa Murphy's III*, 2021 WL

25 1574446, at *2. *Cf. Hot Topic*, 2014 WL 7499375, at *2 (finding plaintiff

---

26 [6] *Papa Murphy's I* and *II* are magistrate judge decisions, and *Papa Murphy's III*'s is a district
27 court decision affirming *Papa Murphy's II*.  The Court will refer to the case generally as *Papa*
28 *Murphy's* but cite the specific decisions accordingly.

shareholders adequately alleged objective falsity where company created "revised set of projections" *after* the buyer "first expressed interest" in the company).

Second, unlike *Papa Murphy's*, the Management Projections in this case are not "hard to square" with Sequenom's optimistic statements about its growth and future prospects. *Papa Murphy's II*, 2021 WL 235865, at *5. The Management Projections presented a bright outlook on Sequenom's future growth: revenue was predicted to increase 28% in 2017 (identical to the Optimistic Case Projection's figure for 2017), 30% in 2018, 22% in 2019, and 28% in 2020. Rec. at 24. These figures are not shabby by any measure. That Sequenom did not rely on the Optimistic Case Projections—which anticipated *even greater* annual revenue growth, as high as 39% in one year—does not on its own lead to the inference that the lower projections were objectively false. That inference is implausible where, as here, the Board had access to both the Management Projections and the Optimistic Case Projections in the second half of 2015, before any offer was made. *See City of Hialeah Employees' Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1176 (D. Or. 2018) (rejecting objective falsity argument where defendant company used lower of two financial projections that were "developed during the same internal review process" and "projected identical performance" in the first year).

In addition, Sequenom's optimism about its long-term growth was not boundless. Throughout 2015 and into 2016, Sequenom experienced consistently negative revenue growth. *See* AC ¶ 70 (2015 Q1), ¶ 77 (2015 Q2), ¶ 105 (2015 Q3), ¶ 123 (2015 Q4), ¶ 132 (2016 Q1).[7] Sequenom told the public that 2015 would be a "transition year," AC ¶¶ 55–114, explaining that it had anticipated short-term

---

[7] It appears that Sequenom took in less revenue in 2015 than it expected. *See* Ex. 4 to Mot. at 4, Doc. No. 123-6 (predicting $150 to $170 million in 2015 revenue); Ex. 7 to Mot. at 5, Doc. No. 123-9 (reporting actual 2015 revenue of $128.2 million). *Cf. Hot Topic*, 2014 WL 7499375, at *6 (finding shareholder plaintiffs adequately alleged objective falsity where company relied on lower, "moderated downwards" set of financial projections despite, among other things, the company's "strong improvement" in revenue growth in previous two years).

declines in NIPT revenue as customers increasingly converted to licensees.  *See, e.g.*, *id.* ¶¶ 70, 78.  But declining revenue was not the only change that Sequenom experienced.  At the start of 2016, Sequenom announced significant restructuring plans, including shutting down its North Carolina lab and cutting its workforce by 20%.  Rec. at 15–16; AC ¶ 116.  Sequenom also confronted a $130 million convertible debt overhang.  AC ¶ 108; *see also* Ex. 8 to Mot. at 8 (discussing debt), Ex. 12 to Mot. at 2 (same).  *Cf. Finjan II*, 58 F.4th at 1062 (noting that a company's "pre-COVID revenue figures are too remote to create the reasonable inference that [the company's] post-COVID revenue would be similar" due to reductions in operations).  Thus, when Sequenom announced in May 2016 that it was "in the early stages of a turnaround," that was hardly a guarantee that the company was on the road to its most successful scenario.  AC ¶ 133.  Actually, Sequenom's stock fell steadily from around $1.60 per share to under $1.00 during the first half of 2016.  Ex. 22 at 15–19.  *Cf. Papa Murphy's II*, 2021 WL 235865, at *4 (noting that in the months leading up to the merger, Papa Murphy had "herald[ed]" successful quarterly results, and the company's "stock price increased 36%").

Plaintiffs make much of the $500 million-in-2020-revenues statement that Sequenom made to investors in 2015.  AC ¶¶ 98, 148; *see* Ex. 10 to Mot. at 17.  According to Plaintiffs, this statement reveals that the company anticipated 2020 revenues of $427 million in its reproductive health business.  Opp'n at 18–19.  Because $427 million is very close to the 2020 revenue figure in the Optimistic Case Projections, Plaintiffs contend that the Optimistic Case Projections must therefore be the most accurate picture of the company's future prospects.  *Id.*  Although this statement supports Plaintiffs' theory of the case, it is far from dispositive.  At best, it confirms that at one point in time, Sequenom gave the public an estimate of one revenue figure from the Optimistic Case Projections.  That is insufficient to infer that Sequenom's reliance on the Management Projections at the time of the merger

was objectively false. Plaintiffs did not plead, for example, particular facts suggesting that Sequenom relied on the $427 million figure leading up to LabCorp's offer, or particular facts showing that it was in some way more reliable than the Management Projections at the time of the merger.

One final point exposes the weakness in Plaintiffs' position: LabCorp's offer was the product of an arms-length deal. "A 'price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value.'" *Finjan II*, 58 F.4th at 1060 (quoting *M.P.M. Enterprises, Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999)). In this case, LabCorp expressed interest in purchasing Sequenom as early as December 2015. Rec. at 14. LabCorp and several companies engaged Sequenom through the end of June 2016 to discuss strategic transactions and purchasing the company itself. *Id.* at 14–18. After LabCorp offered the highest purchase price among the bidders, Sequenom continued to negotiate with it to arrive at an even higher price. *Id.* at 19. The final sale price reflected a *185% premium* over Sequenom's market price on the day before the Board approved the merger. *Id.* at 21. While Plaintiffs desired the price to be even higher, they have failed to adequately plead facts to draw that inference. *See Ocera I*, 2018 WL 7019481, at *8 (finding company's support for arms-length transaction at 52% stock price premium was not objectively false). Thus, the Recommendation was not objectively false.

### B.   Subjective Falsity

To allege subjective falsity, Plaintiffs must show that Defendants "did not actually believe the revenue projections/share-value estimations they issued" in the Recommendation. *Finjan II*, 58 F.4th at 1051. Plaintiffs argue that "each Individual Defendant knew that the Company's oncology program was valuable and the [Management Projections were] inaccurate." AC ¶ 205. For many of the same reasons discussed in the previous section, the Court disagrees. *See* Opp'n at 16

(acknowledging that "significant overlap" may exist between "underlying facts" in subjective and objective falsity analyses (citation omitted)).[8]   The Court only emphasizes two points here.

First, the arms-length nature of Sequenom's merger with LabCorp strongly dispels Plaintiffs' contention that Defendants did not believe in the fairness of the final offer.  "It is unreasonable to infer from these factual allegations that [Sequenom directors] subjectively believed that the revenue projections or the estimated share values produced [from an arms-length sales process] were too low."  *Finjan II*, 58 F.4th at 1064; *accord Ocera I*, 2018 WL 7019481, at *8.

Second, the Amended Complaint insinuates that the Individual Defendants were conflicted.  AC ¶¶ 157–59, 206.  Plaintiffs did not plausibly plead that the Individual Defendants were conflicted.  According to the merger agreement, any Sequenom employee or director's outstanding and unexercised stock and restricted stock units would accelerate and become fully vested at the consummation of the merger.  *Id.* ¶ 158.  But that is unremarkable and not a basis for questioning the Individual Defendants' motives where, as here, those options "w[ere] not a benefit unique to" the Directors because the agreement stated that "*any employee . . . was entitled to that benefit.*"  *In re Finjan Holdings, Inc. Sec. Litig.*, No. 20-cv-4289, 2021 WL 4148682, at *10 (N.D. Cal. Sept. 13, 2021) (emphasis added); *see* AC ¶ 158.

## C.   Misleading Omissions

Section 14(e) also prohibits "omit[ting] to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."  15 U.S.C. § 78n(e).  "[W]hen a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's

---

[8] Even if Plaintiffs adequately alleged subjective falsity, there is no harm if the alleged misrepresentation was not also objectively false.  *See Finjan II*, 58 F.4th at 1056 (describing this as "akin to a harmless error rule").

opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Dearborn*, 856 F.3d at 616 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015)); *see Finjan II*, 58 F.4th at 1055–56 (applying *Omnicare*'s reasoning to Section 14(e) context).

The Amended Complaint highlights two omissions that made the Recommendation allegedly misleading.  First, it alleges that the Recommendation should have provided more details about the oncology program's investment needs and operating costs.  AC ¶¶ 212–13.  Second, it alleges that the Recommendation omitted details of the various financing terms that the Board received in 2016.  *Id.* ¶ 214.  Plaintiffs assert that "[t]his omitted information, if disclosed, would have demonstrated to shareholders that the oncology program was viable, and therefore would have exposed the falsity of the Reduced Forecast's omission of the oncology program."  Opp'n at 18.

This Court is not impressed with Plaintiffs' omissions theory of liability.  The omissions clause of Section 14(e) is "not a general disclosure requirement." *Ominicare*, 575 U.S. at 194.  "Section 14(e) . . . prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis in original).  "No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.  To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.*

Here, Sequenom disclosed the Oncology Projections and provided detailed reasons why they were not considered in the Board's decision and JPM's fairness analysis.  Am. at 5–6.  In addition, Sequenom told shareholders that it was looking

for an investor to make the oncology program commercially viable, and that not a single company moved forward with a licensing, partnering, or acquisition proposal. *Id.* at 4; Rec. at 21. Besides speculating that this information would be revelatory, Plaintiffs do not explain how learning more details about the oncology program's investment needs and operating costs (much less details about loan financing terms) would change a shareholder's impression of the company's state of affairs. Plaintiffs in essence want the Board to show their work in addition to summarizing it, but Section 14(e) requires no such thing. *See Omnicare*, 575 U.S. at 194 (noting that to adequately plead an omissions theory of liability, "the investor cannot just say that the issuer failed to reveal [the] basis" for its opinion).

## D.   Loss Causation

The Amended Complaint fails for the separate and independent reason that it does not adequately allege loss causation. Loss causation is "an economic loss as a result of the acceptance or rejection of the tender offer." *Finjan II*, 58 F.4th at 1055 & n.2 (citations omitted). Plaintiffs allege that the Recommendation's defects "induced the Company's shareholders into accepting an offer that was unfair compared to the actual intrinsic value of the Company." AC ¶ 14. They aver that their economic loss is "the difference between the price Sequenom stockholders received and Sequenom's true value at the time of the Acquisition." *Id.* ¶ 230. This "mere legal conclusion" cannot withstand a motion to dismiss. *Ocera I*, 2018 WL 7019481, at *11.

The Ninth Circuit's decision in *Ocera II* is instructive. 806 F. App'x 603. In that case, the plaintiff shareholders argued that the defendant company and its directors misled them by claiming that a tender offer was fair based on a lower set of management projections about the company's value. *Id.* at 604. The plaintiffs alleged that they suffered economic loss "measured as 'the difference between the price [plaintiff] stockholders received and the true value of their shares at the time

of the [acquisition.]"  *Id.* at 604–05.  According to Plaintiffs, securities analysts believed that the true price of a share ranged from $2.67 to $4.50 at or about the time of the tender offer, whereas the actual merger price was $1.52 per share upfront with a maximum potential value of $4.10.  *Id.* at 605.  The Ninth Circuit ruled that Plaintiffs' argument was "too speculative to plead with particularity that shareholders experienced losses."  *Id.*  Plaintiffs also argued that the higher (unused) set of management projections represented the "true value" of the company.  *Id.*  But the Ninth Circuit found this argument "speculative in the extreme," given the fact that during the sale process, "numerous potential acquirers . . . lost interest," leaving only one buyer "which was still willing to pay more than the existing market price of $1.00 per share on the date of the entry into the merger agreements."  *Id.*

Here, Plaintiffs' allegations of loss causation do not fare any better than those in *Ocera II*.  Plaintiffs do not even attempt to identify the true value of the shares at the time of the tender offer.  Their reliance on the Optimistic Case Projections to assert that a hypothetically higher share price exists is "speculative in the extreme" because LabCorp's $2.40 per share bid was the highest offer at the conclusion of an arms-length sales process—and a significant premium over the market price of $0.84 per share on the day before the Board approved the merger.  *Ocera II*, 806 F. App'x at 605.

Plaintiffs' primary cases on loss causation are inapposite.  Unlike *Papa Murphy's II*, Plaintiffs do not allege that "another company actually assessed the value of [the company] at a higher value at the time of the [ ] merger."  2021 WL 235865, at *8.  In fact, Plaintiffs expressly *disclaim* relying on any analyst reports of the true value of Sequenom's stock.  Opp'n at 23; *cf. In re Hot Topic, Inc. Sec. Litig.*, No. 13-cv2939, 2014 WL 7499375, at *10 (C.D. Cal. May 2, 2014) (ruling that plaintiffs adequately pled loss causation in Section 14(a) case where plaintiffs claimed that analysts valued company shares at higher price than tender offer); *Baum*

*v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 92 (D. Conn. 2019) (ruling that plaintiffs adequately pled loss causation in Section 14(a) case where plaintiff pointed to greater share price calculated from a different set of projections). Where, as here, Plaintiffs allege loss as simply "[t]he difference between the value" of the merger and "the speculative 'true value' of the shares," that "may not alone establish loss causation." *Papa Murphy's II*, 2021 WL 235865, at *8 (quoting *Ocera I*, 2018 WL 7019481, at *11).

## CONCLUSION AND ORDER

Plaintiffs' Section 20(a) claim derives from their Section 14(e) claim and therefore also fails. *See Varjabedian*, 888 F.3d at 409. Because Defendants' falsity and loss causation arguments require dismissal of the Amended Complaint, the Court has no occasion to consider Defendants' additional arguments at this moment.

The Court dismisses the Amended Complaint in its entirety without prejudice. *See Ocera I*, 2018 WL 7019481, at *11. Based on the foregoing, **IT IS HEREBY ORDERED**:

1. Defendants' Request for Judicial Notice (Doc. No. 124) is **GRANTED IN PART AND DENIED IN PART**;

2. Defendants' Amended Motion to Dismiss (Doc. No. 123) is **GRANTED**;

3. The Amended Complaint (Doc. No. 54) is **DISMISSED WITHOUT PREJUDICE**;

4. Plaintiffs may file an Amended Complaint **no later than September 11, 2023**.

**IT IS SO ORDERED**.

DATED:    July 27, 2023

_____
JOHN A. HOUSTON
United States District Judge